J-S75007-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEROY WILSON | : | |
| | : | |
| Appellant | : | No. 3250 EDA 2017 |

Appeal from the Judgment of Sentence May 5, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007374-2015

BEFORE: PANELLA, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY PANELLA, J.: **FILED JUNE 05, 2019**

Appellant, Leroy Wilson, appeals from the judgment of sentence entered on May 5, 2017 in the Philadelphia Court of Common Pleas after he was found guilty of first degree murder, robbery, burglary, and possessing an instrument of crime ("PIC"). Wilson challenges the trial court's discretion in admitting photographic evidence, the sufficiency of the evidence, and the trial court's discretion in imposing sentence. We affirm.

The trial court summarized the facts of this case as follows.

> Defendant served as a handyman to various residents, including the victim, eighty-five-year-old Regina Brunner Holmes, living on or around the 300 block of Roumfort Road in Philadelphia. On June 27, 2015, defendant was in the neighborhood, gardening and moving furniture for one of the victim's neighbors. While he was working, he approached another neighbor, Darlene Adams, and inquired about a car of hers that she had listed for sale. Defendant told Ms. Adams that he believed the car was worth $2,500 and Ms. Adams agreed to sell the car to defendant in exchange for $1,500 and defendant's services. Defendant told Ms. Adams that

he would pay her the following week, after he collected his pay from the victim and another neighbor for services he had performed on their homes.

Two days later, on June 29, 2015, Adam Brunner, the victim's son, received a phone call from his mother's employer, the Chestnut Hill Local, where she worked as a typist and editor. Mr. Brunner was told that his mother had not shown up for work, which was highly unusual because she had never been late. Mr. Brunner went to his mother's home, at 307 Roumfort Road, but was unable to get into the home or get into contact with his mother, so he called the police.

After arriving at the scene and gaining entry into the victim's home, police located the victim lying on her bedroom floor, with multiple lacerations and strangulation marks on her body. In addition, police observed a large amount of blood on her bed and bedroom wall, and multiple emptied purses on the bed and floor. The victim was pronounced dead at the scene. An autopsy revealed that the victim died during the early morning hours of June 28, 2015, from a combination of multiple stab wounds, strangulation, and blunt trauma to her head.

During the course of their investigation, Philadelphia Police Detectives discovered that the victim's ATM card was used three times at a Wells Fargo Bank on Broad Street at approximately 3:30 A.M. on June 28th, the same morning that the victim was killed. Detectives also discovered that one of the victim's credit cards was used to make a large online purchase at Toys R Us. The I.P. address from where the purchase was made was traced to 3137 North Stillman Street in Philadelphia, the home of Micshell Hoskins, defendant's ex-girlfriend, and where defendant periodically resided.

On the morning of the murder, at approximately 3:00 A.M., defendant arrived at Ms. Hoskins's home and knocked on the front door for Hoskins to let him in. Soon after arriving, defendant left, only to come back a short time later. After Hoskins once again let him into her home, defendant told her that he had "caught a body." A few hours later, defendant gave Hoskins a laptop that belonged to the victim and told Hoskins to buy whatever she wanted from Toys R Us.

On June 30, 2015, the victim's car, a 2007 Toyota Corolla, was found near Hoskins's home on the 3100 block of North Stillman Street. Video surveillance recovered from the morning of the murder showed the car travelling onto North Stillman Street at 3:01 A.M. and leaving North Stillman at 3:22 A.M. At 3:28 A.M., video surveillance captured the car entering the parking lot of the Wells Fargo Bank on Broad Street, where the victim's ATM card was used only minutes later. Video surveillance also captured the individual using the victim's card at the ATM machine, although his face was not visible. However, Micshell Hoskins identified the individual depicted in the video surveillance as defendant by his walk, the manner in which he wore his pants, and because he was wearing the same sweatshirt that defendant had been wearing the day before the murder. Jessica Gaymon, defendant's girlfriend at the time of the murder, also identified defendant as the individual using the victim's card at the ATM machine from his clothes, his build, and the manner in which he pulled up his pants.

Trial Court Opinion, 12/21/2017, at 2-4 (citations to the record omitted).

On May 5, 2017, a jury convicted Wilson of one count each of first-degree murder, robbery, burglary, and PIC. The trial court imposed the mandatory sentence of life in prison for the murder charge, with two consecutive terms of ten to twenty years' imprisonment for robbery and burglary, and a consecutive term of two and one half to five years' imprisonment for PIC, resulting in an aggregate sentence of life plus twenty-two and one half to forty five years' imprisonment.

The court denied Wilson's post-sentence motions. This appeal followed.

In his first issue on appeal, Wilson contends the trial court abused its discretion when it admitted photograph number 43 into evidence and showed it to the jury. He describes the photograph as a gruesome photograph of the

victim's face and claims it was unduly prejudicial and inflammatory, outweighing any probative value.

There is a patent problem with Wilson's appeal: the photograph at issue is not in the certified record. It is an appellant's responsibility to ensure that the certified record contains all the items necessary to review his claims. *See Commonwealth v. B.D.G.*, 959 A.2d 362, 372 (Pa. Super. 2008). "When a claim is dependent on materials not provided in the certified record, that claim is considered waived." *Commonwealth v. Petroll*, 696 A.2d 817, 836 (Pa. Super. 1997) (citation omitted).

Without the photograph, we cannot conduct a review of Wilson's issue presented on appeal. *See Commonwealth v. Powell*, 956 A.2d 406, 423 (Pa. 2008) (finding claim that an autopsy photograph was unduly prejudicial waived "[b]ecause the record does not contain the photograph appellant refers to, we cannot assess his description and claim"); *Petroll*, 696 A.2d at 836 (finding claim of improperly admitted photographs waived where they were not in the certified record). Therefore, we find Wilson's claim waived.

In his second issue on appeal, Wilson argues the verdict was against the sufficiency of the evidence. Specifically, in his Rule 1925(b) statement, Wilson declares there was no DNA or fingerprints linking him to the crime scene or stolen car and that the cell phone analysis demonstrated that he could have been one-half mile away at the time of the crime. *See* Appellant's Rule 1925(b) Statement, 11/15/2017, at 2. Wilson is not challenging the sufficiency

of the evidence to support any of the specific legal definitions of his convictions. Rather, he is challenging the sufficiency of the evidence to establish that he was person who committed the crimes.

Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. **See Commonwealth v. Dale**, 836 A.2d 150, 152 (Pa. Super. 2003). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Bruce**, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

"The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." **Id**. (citation omitted). "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." **Commonwealth v. Kinney**, 863 A.2d 581, 584 (Pa. Super. 2004) (citation omitted). Thus, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." **Bruce**, 916 A.2d at 661 (citation omitted).

The trial court, in its December 21, 2017, opinion, has thoroughly reviewed this claim and disposed of the argument on the merits. We have

reviewed the parties' briefs, the relevant law, the certified record, and the trial court's well-written opinion. The trial court's findings of fact and conclusions of law comprehensively dispose of Wilson's second issue on appeal, with appropriate references to the record and without legal error. **See** Trial Court Opinion, 12/21/17, at 7-11. We therefore adopt the court's reasoning as our own. As it is clear that there is overwhelming evidence in support of the verdict, we find Wilson's second issue without merit.

In Wilson's third issue on appeal, he contends the sentence imposed by the court is cruel and unusual punishment[1] since he has a mandatory life sentence without the possibility of parole. He acknowledges this is a challenge to the discretionary aspects of his sentence. **See** Appellant's Brief, at 13.

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." **Commonwealth v. McAfee**, 849 A.2d 270, 274 (Pa. Super. 2004) (citation omitted).

> An appellant challenging the discretionary aspects of his sentence
> must invoke this Court's jurisdiction by satisfying a four-part test:

---

[1] We note that although Wilson includes the phrase "cruel and unusual punishment" in his statement of the questions involved, his entire analysis is devoid of any constitutional argument, and instead focuses solely on an abuse of discretion in sentencing challenge. **See** Appellant's Brief, at 13-14. Thus, we interpret this issue as only challenging the trial court's discretion and do not review it on a constitutional basis. However, even if we were to address this issue as a constitutional matter we would find it without merit as the horrific facts of this case justify the sentence without offending "evolving standards of decency or a balanced sense of justice." **Commonwealth v. Ehrsam**, 512 A.2d 1199, 1210 (Pa. Super. 1986).

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42. Pa.C.S.A. § 9781(b).

**Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa. Super. 2010) (citation omitted; brackets in original).

Here, Wilson preserved his issues through a timely post-sentence motion and filed a timely appeal. Counsel has included the required Rule 2119(f) statement. Thus, we must determine if Wilson has raised a substantial question for our review.

We examine an appellant's Rule 2119(f) statement to determine whether a substantial question exists. **See Commonwealth v. Tirado**, 870 A.2d 362, 365 (Pa. Super. 2005). "Our inquiry must focus on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." **Id**. (citation omitted); **see also** Pa.R.A.P. 2119(f).

Wilson "must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code." **McAfee**, 849 A.2d at 274 (citation omitted). That is, "the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a

particular fundamental norm underlying the sentencing process." ***Tirado***, 870 A.2d at 365.

In his Rule 2119(f) statement, Wilson argues, "Although the trial court stated in its OPINION that all sentences the appellant received were mandatory except for the PIC count, they could have been run concurrent to the Life sentence Without the Possibility of Parole instead of consecutive."

Under 42 Pa.C.S.A. § 9721, the court has discretion to impose sentences consecutively or concurrently and, ordinarily, a challenge to this exercise of discretion does not raise a substantial question. ***Commonwealth v. Moury***, 992 A.2d 162, 171 (Pa. Super. 2010). The imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment. ***Id.***, at 171-172.

After full review of the record before us, we do not find the aggregate sentence is unduly harsh considering the extreme and gruesome nature of the crimes. Therefore, Wilson has failed to raise a substantial question. Even if we were to reach the merits of his argument, we would find no abuse of the court's discretion. Wilson was found guilty of killing the eighty-five year old victim in her home, in the middle of the night, and did so by a combination of multiple stab wounds, strangulation, and blunt trauma to her head, all for a

credit card, a laptop computer, and a car. Further, the court fully explained

its reasons on the record for imposing the aggregate sentence.

> Also I do have discretion as to how these sentences should run. I'm going to exercise that discretion and run all of the sentences consecutive to each other. So the aggregate sentence is life in prison plus 22 and a half to 45 years. That is the most that I can give you. So that's what I will give you.
>
> While we all know that no one can actually serve more than their entire life in prison, the reason for this kind of a sentence is to telegraph to the prison, to telegraph to the governor, the Board of Pardons that this was more terrible than the typical first degree murder case and deserving of the maximum sentence possible.

N.T., 5/5/2017, at 157. The trial court clearly considered the totality of

Wilson's conduct and the horrible facts of this case and sentenced him

accordingly. Thus, no relief is due.

> Judgment of sentence affirmed.


Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/5/19

**FILED**

DEC 2 1 2017

Office of Judicial Records
Appeals/Post Trial

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF            :            CP-51-CR-0007374-2015
PENNSYLVANIA

CP-51-CR-0007374-2015 Comm. v. Wilson, Leroy
Opinion

8046658041

v.

LEROY WILSON

## OPINION

BRONSON, J.                                    December 21, 2017

On May 5, 2017, following a jury trial before this Court, defendant Leroy Wilson was convicted of one count each of murder of the first degree (18 Pa.C.S. § 2502), robbery (18 Pa.C.S. § 3701(a)(1)(i)), burglary (18 Pa.C.S. § 3502(a)(1)), and possessing an instrument of crime ("PIC") (18 Pa.C.S. § 907(a)). The Court immediately imposed the mandatory sentence of life in prison for the murder charge (18 Pa.C.S. § 1102(a)(1)), with two consecutive terms of 10 to 20 years imprisonment for robbery and burglary, and a consecutive term of 2 ½ to 5 years imprisonment for possessing an instrument of crime, for an aggregate sentence of life plus 22 ½ to 45 years in prison. Defendant filed post-sentence motions, which the Court denied on August 31, 2017.

Defendant has now appealed from the judgment of sentence entered by the Court on the grounds that: 1) the court abused its discretion when it allowed gruesome pictures of the victim's face to be admitted into evidence and shown to the jury; 2) the evidence was legally insufficient to sustain the verdict; 3) the verdict was against the weight of the evidence; and 4) the discretionary part of defendant's sentence constitutes cruel and unusual punishment. Concise

Statement of Matters Complained on Appeal Pursuant to Pa.R.A.P. Rule 1925(b) ("Statement of Matters") at ¶¶ 1-4.[1] For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Police Officers Christopher Reed, Jameica Pierce, and Christine Hilbert, Philadelphia Police Detectives John Verrecchio, Frank Mullen, Thorsten Lucke, James Dunlap, and John Logan, Philadelphia Police Sergeant Christine Mellett, Philadelphia Chief Medical Examiner Dr. Samuel Gulino, Scott Copeland of the Philadelphia Police Department's Latent Print Unit, Forensic Scientists Hung Le and Lynn Haimowitz of the Philadelphia Police Department's Criminalistics Unit, and Adam Brunner, Darlene Adams, Ronald DiChristofaro, Stephen Brunelli, Jessica Gaymon, and Micshell Hoskins. Defendant presented no testimony. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

Defendant served as a handyman to various residents, including the victim, eighty-five-year-old Regina Brunner Holmes, living on or around the 300 block of Roumfort Road in Philadelphia. N.T. 5/2/17 at 101, 104-105. On June 27, 2015, defendant was in the neighborhood, gardening and moving furniture for one of the victim's neighbors. N.T. 5/2/17 at 106. While he was working, he approached another neighbor, Darlene Adams, and inquired about a car of hers that she had listed for sale. N.T. 5/2/17 at 107-108. Defendant told Ms. Adams that he believed the car was worth $2,500 and Ms. Adams agreed to sell the car to defendant in exchange for $1,500 and defendant's services. N.T. 5/2/17 at 108-109, 115. Defendant told Ms. Adams that he would pay her the following week, after he collected his pay

---

[1] Defendant's claims have been reordered for ease of analysis.

from the victim and another neighbor for services he had performed on their homes. N.T. 5/2/17 at 109-110.

Two days later, on June 29, 2015, Adam Brunner, the victim's son, received a phone call from his mother's employer, the Chestnut Hill Local, where she worked as a typist and editor. N.T. 5/2/17 at 81, 88. Mr. Brunner was told that his mother had not shown up for work, which was highly unusual because she had never been late. N.T. 5/2/17 at 89. Mr. Brunner went to his mother's home, at 307 Roumfort Road, but was unable to get into the home or get into contact with his mother, so he called the police. N.T. 5/2/17 at 90.

After arriving at the scene and gaining entry into the victim's home, police located the victim lying on her bedroom floor, with multiple lacerations and strangulation marks on her body. N.T. 5/2/17 at 91-92, 96-97. In addition, police observed a large amount of blood on her bed and bedroom wall, and multiple emptied purses on the bed and floor. N.T. 5/2/17 at 97. The victim was pronounced dead at the scene. N.T. 5/2/17 at 172. An autopsy revealed that the victim died during the early morning hours of June 28, 2015, from a combination of multiple stab wounds, strangulation, and blunt trauma to her head. N.T. 5/3/17 at 224.

During the course of their investigation, Philadelphia Police Detectives discovered that the victim's ATM card was used three times at a Wells Fargo Bank on Broad Street at approximately 3:30 A.M. on June 28th, the same morning that the victim was killed. N.T. 5/3/17 at 45; 5/4/17 at 21-26. Detectives also discovered that one of the victim's credit cards was used to make a large online purchase at Toys R Us. N.T. 5/3/17 at 46. The I.P. address from where the purchase was made was traced to 3137 North Stillman Street in Philadelphia, the home of Micshell Hoskins, defendant's ex-girlfriend, and where defendant periodically resided. N.T. 5/3/17 at 46, 88, 89, 95, 96.

3

On the morning of the murder, at approximately 3:00 A.M., defendant arrived at Ms. Hoskins's home and knocked on the front door for Hoskins to let him in. N.T. 5/3/17 at 102. Soon after arriving, defendant left, only to come back a short time later. N.T. 5/3/17 at 102-104. After Hoskins once again let him into her home, defendant told her that he had "caught a body." N.T. 5/3/17 at 104-106. A few hours later, defendant gave Hoskins a laptop that belonged to the victim and told Hoskins to buy whatever she wanted from Toys R Us. N.T. 5/3/17 at 106-107, 111, 113.

On June 30, 2015, the victim's car, a 2007 Toyota Corolla, was found near Hoskins's home on the 3100 block of North Stillman Street. N.T. 5/3/17 at 29, 32. Video surveillance recovered from the morning of the murder showed the car travelling onto North Stillman Street at 3:01 A.M. and leaving North Stillman at 3:22 A.M. N.T. 5/4/17 at 23. At 3:28 A.M., video surveillance captured the car entering the parking lot of the Wells Fargo Bank on Broad Street, where the victim's ATM card was used only minutes later. N.T. 5/4/17 at 24-26. Video surveillance also captured the individual using the victim's card at the ATM machine, although his face was not visible. N.T. 5/4/17 at 26-26. However, Micshell Hoskins identified the individual depicted in the video surveillance as defendant by his walk, the manner in which he wore his pants, and because he was wearing the same sweatshirt that defendant had been wearing the day before the murder. N.T. 5/3/17 at 124. Jessica Gaymon, defendant's girlfriend at the time of the murder, also identified defendant as the individual using the victim's card at the ATM machine from his clothes, his build, and the manner in which he pulled up his pants. N.T. 5/2/17 at 203-205.

4

## II. DISCUSSION

### A. Admission of Photographs Displaying the Victim's Facial Injuries

First, defendant alleges that "the court abused its discretion when it allowed gruesome pictures of the victims [sic] face to be admitted into evidence and shown to the jury. These photographs were unduly prejudicial and inflammatory and greatly outweighed their probative value. The victims [sic] face was brutalized. The forensic pathologist could have described the injuries to the jury with a chart and did not need photographs. The court, in reviewing the photographs, did exclude the most gruesome photo but there were more horrible pictures of the face that were allowed to be shown to the jury." Statement of Errors at ¶ 1. This claim is without merit.

> "When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:
>
> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors."

*Commonwealth v. Johnson*, 42 A.3d 1017, 1033-34 (Pa. 2012) (*quoting Commonwealth v. Pruitt*, 951 A.2d 307, 319 (Pa. 2008)). A photograph is inflammatory if "the photo is so gruesome it would tend to cloud the jury's objective assessment of the guilt or innocence of the defendant." *Commonwealth v. Funk*, 29 A.3d 28, 33 (Pa. Super. 2011) (*en banc*), *appeal denied*, 40 A.3d 1234 (Pa. 2012). Testimony from a medical examiner as to the nature and extent of the decedent's injuries, does not render photographs of the injuries duplicative or inadmissible. *Commonwealth v. Woodard*, 129 A.3d 480, 495 (Pa. 2015). Further, photographic images of a

5

homicide victim are often relevant to prove the criminal intent of a defendant. *Pruitt*, 951 A.2d at 319; *Commonwealth v. Solano*, 906 A.2d 1180, 1191 (Pa. 2006).

Here, the Commonwealth sought to introduce a number of photographs taken at the crime scene and at the victim's autopsy. N.T. 5/1/17 at 10. Defendant's counsel made an oral motion in limine for a pre-trial ruling on the admissibility of these pictures. N.T. 5/1/17 at 2. The Court heard argument and examined each photograph outside the presence of the jury. N.T. 5/1/17 at 10-21, 178-209; N.T. 5/2/17 at 3-6. The Court ruled on each individual photograph applying the applicable standard, admitting several photographs, excluding others, and requiring one to be redacted. N.T. 5/2/17 at 3-4. While defendant now complains of the admission of gruesome "photographs" of the victim's face, defendant objected during the motion hearing to only one ruling of the Court: the admission of crime scene photograph number 43, which depicted the neck and facial injuries of the victim. N.T. 5/1/17 at 19; N.T 5/2/17 at 5. Accordingly, his objection to the admission of any other photographs has been waived. *See* Pa.R.E. 103(a); *see* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Stevenson*, 894 A.2d 759, 766 (Pa. Super. 2006), *appeal denied*, 917 A.2d 846 (Pa. 2007) (same).

Crime scene photograph number 43 was one of two photographs that depicted the victim's entire head and neck. The other was an autopsy photograph, which was marked as autopsy photograph A-A. Both showed the extensive injuries inflicted on the victim including multiple stab wounds, strangulation marks, and gashes. N.T. 5/1/17 at 17. Because there were no witnesses to the murder here at issue, these extensive injuries were essential and irreplaceable evidence of the defendant's intent to kill the victim. Comparing the two photographs, the Court found that the crime scene photograph was less likely to disturb the jurors because it was not a

6

close-up photograph of the injuries, her eyes were closed, and much of the detail was obscured by blood. N.T. 5/1/17 at 18; N.T. 5/2/17 at 5. Accordingly, the Court excluded the autopsy photograph, but admitted the crime scene photograph. N.T. 5/2/17 at 5-6. Although the Court did not believe the crime scene photograph to be inflammatory, even if it had been, it had essential evidentiary value that clearly outweighed any likelihood of inflaming the minds and passions of the jurors. Accordingly, it was properly admitted. *Johnson*, 42 A.3d at 1033-1034.

In addition, while defendant argues that the medical examiner could have described the victim's injuries with a chart, instead of the photograph, the Commonwealth explained during the hearing that the medical examiner was asked to prepare a diagram of the injuries, but could not do so because there were simply too many injuries to the victim's face. N.T. 5/1/17 at 188. Moreover, as stated above, testimony from a medical examiner detailing a victim's injuries and cause of death does not render photographs of the injuries duplicative and inadmissible. *Woodard*, 129 A.3d at 495. No relief is due.

### B. Sufficiency of the Evidence

Next, defendant alleges that "the verdict was against the sufficiency of the evidence." Statement of Matters at ¶ 3. Defendant argues that the "evidence at trial was void of any of the defendant's DNA or fingerprints at the crime scene....Mrs. Holmes' stolen 2007 Toyota Corolla was also lacking any of the defendants [sic] DNA or fingerprints. The Commonwealth's Cell Phone Analysis also demonstrated that the defendant could have been one-half square mile away at the time of the crime." *Id.* This claim without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the fact-finder to find every element of the

7

crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Id.* Specifically, there is no authority requiring the verdict to be supported by forensic evidence. Finally, "[i]f the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001)).

### 1. First Degree Murder

"The evidence is sufficient to establish first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with the specific intent to kill." *Commonwealth v. Edwards*, 903 A.2d 1139, 1146 (Pa. 2006). The specific intent to kill can be inferred "from the manner in which the homicide was committed." *Commonwealth v. Hughes*, 865 A.2d 761, 793 (Pa. 2004).

First, there was ample evidence from which a reasonable juror could conclude that defendant killed the victim. As discussed above, cell phone records established that defendant was within a half-square mile radius of the crime scene, in the early morning hours of June 28, 2015, the approximate time of the murder, even though he was temporarily living at a residence located four-and-a-half miles away. N.T. 5/3/17 at 89, 95; N.T. 5/4/17 at 161, 164-165. Additionally, the victim's car was found on the same street as the home of defendant's ex-girlfriend, Michell Hoskins, where defendant was temporarily living. N.T. 5/3/17 at 29, 89, 95. Video surveillance recovered from the morning of the murder showed the car being driven onto

8

that street at 3:01 A.M. and leaving at 3:22 A.M.. N.T. 5/4/17 at 23. At 3:28 A.M., the car was captured entering the parking lot of the Wells Fargo Bank on Broad Street. N.T. 5/4/17 at 24-26. Furthermore, video surveillance captured an image of an individual using the victim's card at the bank's ATM machine. N.T. 5/4/17 at 26. Michell Hoskins identified the individual as defendant, primarily because he was wearing the same sweatshirt that he wore the afternoon preceding the murder. N.T. 5/3/17 at 124. Hoskin's identification was corroborated by video surveillance recovered from a check cashing store, which defendant and Hoskins had visited that afternoon. N.T. 5/3/17 at 124-125. That video contained clear images of defendant's face and clothing, and showed him wearing the same distinctive "Pacific League" sweatshirt depicted in the Wells Fargo video. N.T. 5/3/17 at 124-126.

Hoskins also testified that later that morning, following the murder, defendant gave her the victim's laptop and told her to buy whatever she wanted. N.T. 5/3/17 at 106-107, 111. She made a large online purchase at Toys R Us and defendant entered the credit card information for her, using the victim's credit card number. N.T. 5/3/17 at 46, 111-112. Further, defendant's fingerprints were found on the laptop and his DNA was found on the laptop's power cord. N.T. 5/4/17 at 89-91, 136-137. Finally, Hoskins testified that when defendant arrived at her house at around 3:00 A.M., following the approximate time of the murder, he told her that he had "caught a body." N.T. 5/3/17 at 104-106. Defendant's girlfriend at the time of the murder, Jessica Gaymon, testified that days after the murder, defendant confessed to her that "he killed before." N.T. 5/2/17 at 192, 194. Gaymon also identified defendant as the individual using the victim's ATM card after the murder. N.T. 5/2/17 at 203-205.

Additionally, ample evidence was presented establishing that defendant acted with the specific intent to kill. The medical examiner, Dr. Gulino, testified that the victim died "as a

9

result of a combination of multiple stab wounds, strangulation, and blunt trauma to her head." N.T. 5/3/17 at 224. Specifically, Dr. Gulino testified that the victim suffered multiple stab wounds to the face, the front of the right ear, the jawline, the chin, the neck, the back, perforating the right lung, and the hands. N.T. 5/3/17 at 227-240. The wounds on the victim's hands were determined to be defensive wounds, implying that the victim was putting her hands up, and possibly trying to grab the murder weapon, in an attempt to protect herself from her attacker. N.T. 5/3/17 at 239. Additionally, Dr. Gulino testified that the victim suffered blunt impact wounds to her entire face, except for the upper forehead. She also sustained blunt impact wounds to her chest, scalp, ribcage, left thigh, both arms, and both hands. The wounds to the scalp were severe enough to show evidence of brain damage. N.T. 5/3/17 at 240-247, 253. Like the stab wounds, the impact wounds on the victim's hands were determined to be defensive wounds. N.T. 5/3/17 at 246. Finally, Dr. Gulino testified that the victim had a ligature mark around her neck and fractures to her thyroid cartilage, both of which are associated with strangulation. N.T. 5/17/17 at 247, 250-251. While the medical examiner was unable to determine the order of these injuries, he was able to determine that the victim was alive for all of them. N.T. 5/3/17 at 253-254. All of this was compelling evidence that defendant intentionally killed the victim and was guilty of first degree murder.

### 2. Robbery

To convict a defendant of robbery, the Commonwealth must prove that defendant "inflicted serious bodily injury upon another person in the course of committing a theft." *Commonwealth v. Jacoby*, 170 A.3d 1065, 1079 (Pa. 2017) (citing 18 Pa.C.S. § 3701(a)(1)(i)).

As described above, the victim sustained numerous injuries, including multiple stab wounds, strangulation, and blunt trauma to her head. N.T. 5/3/17 at 227-255. She was

10

pronounced dead on the scene and was determined to have died from these injures. N.T. 5/2/17 at 172; N.T. 5/3/17 at 224.

Furthermore, Sergeant Mellett testified that four or five of the victim's purses were found emptied on the victim's bed and on the floor. N.T. 5/2/17 at 97. Additionally, as described above, defendant was identified driving the victim's car and using her ATM card the morning of the murder. N.T. 5/2/17 at 204-205; N.T. 5/3/17 at 124; N.T. 5/4/17 at 23-26. Further, defendant used the victim's credit card to make the online purchase at Toys R Us. N.T. 5/3/17 at 46, 111-112. Defendant's fingerprints were found on the victim's laptop that was used to make the purchase. N.T. 5/4/17 at 89-91. This evidence established that defendant stole these items from the victim, and that during the theft, he inflicted serious bodily injury upon her. Accordingly, there was ample evidence that defendant was guilty of robbery.

3. Burglary

A person commits the offense of burglary "if, with the intent to commit a crime therein, the person...enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any person is present." 18 Pa.C.S. § 3502(a)(1). The intent to commit a crime within the premises may be inferred from the circumstances, and may be inferred from defendant's actions and words, which "bear a reasonable relation to the commission of a crime." *Commonwealth v. Alston*, 651 A.2d 1092, 1094 (Pa. 1994).

Here, the evidence established that defendant entered the victim's home between the late evening and early morning hours of June 27 and June 28, 2015. As described above, defendant's cell phone records placed him around the scene during the approximate time of the murder. N.T. 5/4/17 at 161, 164-165. Defendant's intent to commit a crime upon entry is demonstrated by

11

defendant's brutal killing of the victim and the taking of her possessions, detailed above. Accordingly, this evidence established that defendant entered the victim's home, while she was home, and that he intended to commit a crime upon entering. This was ample evidence to establish that defendant was guilty of burglary.

### 4. Possessing an Instrument of Crime

To sustain a conviction for PIC, the Commonwealth must establish that defendant "possesse[d] any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). An "instrument of crime" is defined as "(1) [a]nything specially made or specially adapted for criminal use....[or] (2) [a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d). A knife may constitute an instrument of crime. *Commonwealth v. Robertson*, 874 A.2d 1200, 1209 (Pa. Super. 2005).

As described above, the medical examiner, Dr. Gulino, testified that the victim had suffered multiple stab wounds during the incident. N.T. 5/3/17 at 227-240. Additionally, Dr. Gulino was able to determine that a knife was used in the attack, from marks left on the victim's skin. N.T. 5/3/17 at 251-252. Further, a knife was recovered down the street from the scene of the murder, in a church's trash can. N.T. 5/2/17 at 144-145. Coupled with the evidence described above, this particular evidence established that defendant possessed a knife for a criminal purpose, used it to commit a crime, and possessed it under circumstances not appropriate for any lawful use of a knife. Accordingly, the evidence established that defendant was guilty of PIC.

12

## C. Weight of the Evidence

Defendant next alleges that the verdict was against the weight of the evidence. Statement of Matters at ¶ 2. Specifically, defendant claims that the "evidence at trial was void of any of the defendant's DNA or fingerprints at the crime scene....Mrs. Holmes' stolen 2007 Toyota Corolla was also lacking any of the defendants [sic] DNA or fingerprints. The Commonwealth's Cell Phone Analysis also demonstrated that the defendant could have been one-half square mile away at the time of the crime." *Id.* This claim is without merit.

It is well-established that a new trial may only be granted by the trial court where the verdict was so contrary to the weight of the evidence as to "shock one's sense of justice." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004), *appeal denied*, 878 A.2d 864 (Pa. 2005) (quoting *Commonwealth v. Hunter*, 554 A.2d 550, 555 (Pa. Super. 1989)). Moreover, credibility determinations are solely within the province of the fact-finder, and "[a]n appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact." *Commonwealth v. Taylor*, 63 A.3d 327, 330 (Pa. Super. 2013) (quoting *Commonwealth v. Shaffer*, 40 A.3d 1250, 1253 (Pa. Super. 2012)). In considering a claim that the trial court erred in refusing to find that a verdict was against the weight of the evidence, "appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Id.* (quoting *Shaffer*, 40 A.3d at 1253).

It is true that while defendant's fingerprints and DNA were recovered from the victim's stolen laptop and power cord, neither was found at the crime scene, nor on the victim's stolen vehicle. N.T. 5/4/17 at 87-94, 131-141. However, evidence was offered to provide explanations for their absences. According to fingerprint analysis and identification expert, Scott Copeland, not all surfaces are amenable to being fingerprinted. N.T. 5/4/17 at 100. Further, DNA analysis

13

expert, Lynn Haimowitz, explained that DNA can be erased through cleaning, certain bacteria, and environmental factors, such as UV light, extreme heat, or rain. N.T. 5/4/17 at 140-141. Finally, while it is also true that defendant's cell phone records could not provide an exact GPS location of his whereabouts, they placed defendant within a half-square mile radius of the crime scene, in the early morning hours of June 28, 2015, the approximate time of the murder, when defendant's temporary residence was located four-and-a-half miles away. N.T. 5/3/17 at 89, 95; N.T. 5/4/17 at 156, 161, 164-165.

In any event, the evidence outlined above in section B plainly establishes that defendant was guilty of all charges. Because the evidence fully supported the verdict, the Court did not abuse its discretion in denying defendant's motion for a new trial.

### D. Abuse of Discretion at Sentencing

Finally, defendant claims that "[t]he discretionary part of the sentence (22 ½ -45 years) is cruel and unusual punishment since the defendant has a mandatory Life sentence without the possibility of parole." Statement of Matters at § 4. This claim is without merit.

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of that discretion." *Commonwealth v. Anderson*, 552 A.2d 1064, 1072 (Pa. Super. 1988), *appeal denied*, 571 A.2d 379 (Pa. 1989); *see Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). The sentencing court must consider the need to protect the public, the gravity of the offense in relation to the impact upon the victim, the rehabilitative needs of the defendant, and the sentencing guidelines. 42 Pa.C.S. § 9721(b); *see Commonwealth v. Hyland*, 875 A.2d 1175, 1184 (Pa. Super. 2005).

As to consecutive sentences, "[l]ong standing precedent of [the Superior] Court recognizes that [the Sentencing Code] affords the sentencing court discretion to impose its

14

sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed." *Commonwealth v. Marts*, 889 A.2d 608, 612 (Pa. Super. 2005). Accordingly, the decision to sentence consecutively fails to raise a substantial question on appeal unless that decision "raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." *Commonwealth v. Mastromarino*, 2 A.3d 581, 587 (Pa. Super. 2010). Therefore, an appellate court will not disturb consecutive sentences unless the aggregate sentence is "grossly disparate" to the defendant's conduct, or "viscerally appear[s] as patently 'unreasonable.'" *Commonwealth v. Gonzalez-Dejusus*, 994 A.2d 595, 599 (Pa. Super. 2010).

As to defendant's claim that his sentence was "cruel and unusual punishment," it is well-established that "[a] punishment authorized by a legislature violates the proscription against cruel and unusual punishment only if it is so disproportionate to an offense as to offend evolving standards of decency or balanced sense of justice." *Commonwealth v. Carr*, 543 A.2d 1232, 1235 (Pa. Super. 1988).

Here, only one of defendant's sentences was left within the court's discretion, as his first degree murder, burglary, and robbery convictions all carried mandatory sentences. *See* 18 Pa.C.S. § 1102(a)(1) (mandatory sentence of life in prison for first degree murder); 42 Pa.C.S. § 9714 (mandatory sentence of 10 to 20 years in prison for a conviction of a second "crime of violence," including robbery and burglary).[2] The only sentence for which the Court had discretion was for defendant's misdemeanor PIC conviction. The parties agreed at sentencing that defendant had a prior record score of five, and that PIC had an offense gravity score of three.

---

[2] In 2008, defendant was convicted of gunpoint robbery in Florida, which qualified as a conviction of a prior crime of violence under the statute. N.T. 5/5/17 at 146. Accordingly, his robbery and burglary convictions in the instant case were "second strikes" and carried mandatory sentences of 10-20 years incarceration.

N.T. 5/5/17 at 147-148. The guideline range also agreed to was 6 to 16 months. N.T. 5/5/17 at 148.

It is true that the Court departed from the guideline range and sentenced defendant to the maximum 2 ½ to 5 years incarceration for his PIC conviction. However, the departure was well-justified by the facts of the case. As detailed above, the eighty-five year old victim was killed in her home, in the middle of the night, from a combination of multiple stab wounds, strangulation, and blunt trauma to her head. N.T. 5/3/17 at 224, 257. Moreover, she was alive for all of these injuries. N.T. 5/3/17 at 237. These kind of horrific facts were well beyond the norm contemplated by the guidelines for PIC.

For the same reasons, the Court's decision to run the sentences consecutively was also well-justified. As the Court explained to defendant, while it is clear that he cannot possibly serve more than his entire life in prison, the reason for the consecutive sentences was "to telegraph to the governor, the Board of Pardons, that this was more terrible than the typical first degree murder case and deserving the maximum sentence possible." N.T. 5/5/17 at 157. Clearly the sentence was commensurate with the defendant's conduct in this case. Accordingly, no relief is due.

### III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

_____
GLENN B. BRONSON, J.

16

**Commonwealth v. Leroy Wilson**
**Type of Order: 1925(a) Opinion**

CP-51-CR-0007374-2015

### PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel/Party:**

Earl G. Kauffman, Esquire
1515 Market Street, Suite 1200 #538
Philadelphia, PA 19102

Type of Service:       ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**District Attorney:**

Hugh J. Burns, Esquire
Chief of Appeals Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499

Type of Service       ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**Additional Counsel/Party:**

Joseph D. Seletyn, Esquire
Prothonotary
Office of the Prothonotary – Superior Court
530 Walnut Street, Suite 315
Philadelphia, PA 19106

Type of Service:       ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**Dated: December 21, 2017**

_____
Kaitlin D. Shire
Law Clerk to Hon. Glenn B. Bronson